# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                    Case No. 21-CR-1232  -MV

ALFONSO RAMIREZ,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Alfonso Ramirez's Opposed Motion to Suppress. Doc. 35.  The government filed a response [Doc. 39], and Mr. Ramirez filed a reply [Doc. 41]. The Court held an evidentiary hearing on the motion on June 21, 2023.  Having considered the briefs, exhibits, witness testimony, relevant law, and being otherwise fully informed, the Court finds that Mr. Ramirez's Opposed Motion to Suppress Statements [Doc. 35] is well-taken and will be **GRANTED**.

## BACKGROUND

Mr. Ramirez is charged with one count of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924.  Doc. 17.  At issue in this opinion is whether an officer with the Albuquerque Police Department violated Mr. Ramirez's Fourth Amendment rights when he detained him on July 26, 2021.  The following represents the Court's findings of fact, based on the evidence submitted by the parties and the testimony presented at the June 21, 2023 hearing.[1]

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. Fed. R. Crim. P. 12(d).  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d) purposes.  The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to

## I.     Facts

Around 1:20 PM on July 26, 2021, an individual called 911 to report that two men in a black Chevrolet Avalanche had twice fired at his car as he was driving in Albuquerque.  Gov't Ex. 1 at 1:07, 5:01; Gov't Ex. 3 at 1.  One of those rounds struck the individual's driver-side door. Gov't Ex. 1 at 5:27.  Describing the individuals who shot at him, the man stated, "I think they were Native . . . not too sure though.  I'm not 100 percent."  *Id.* at 10:13.  He did not provide any other identifying details.  *See generally* Gov't Ex. 1.

While still on the phone with 911, the individual flagged down Albuquerque Police Department Officer Luis Macias.  *Id.* at 1:25; Rough Hearing Transcript ("H'rg Tr.") at 9:4–9. Officer Macias then called for backup and followed the Avalanche.  H'rg Tr. at 11:4–5. Eventually, he located the Avalanche and two men walking away from it on Trumbull Avenue. *Id.* at 11:2–4.  The men subsequently fled in opposite directions with one jumping a fence into the Van Cleave Place Mobile Home.  *Id.* at 39:22–25, 46:5–8.  In an effort to locate that individual, officers delineated a permitter.  *Id.* at 46:5–8.  Officers later identified the man as Kaelin Lucio and took him into custody at 4:10 PM.  Gov't Ex. 3 at 8.  At the time, Mr. Lucio—who had long black hair—was wearing purple basketball shorts and a grey shirt.[2]  Gov't Ex. 4 at 9:20.

That afternoon, officers also received information about the second individual. Specifically, at 1:38 PM, a second man ("Concerned Citizen") called 911 to report that an

---

decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure.  *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock*, 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privilege, do not bind the Court.  Fed. R. Evid. 104(a).

[2] Records from that day document different accounts of Mr. Lucio's shirt, with some referencing a black—rather than grey—shirt.  Gov't Ex. 4 at 10:02, 17:15.

individual whom he described as "Spanish with tattoos on his arms" and wearing "blue basketball shorts" was on General Hodges Street moving south towards Susan Avenue. Gov't Ex. 5 at 0:11, 1:15. The Concerned Citizen stated that the man attempted to hide something by a vehicle, but subsequently picked the item up and wrapped it in a black shirt. *Id.* at 2:15. The Concerned Citizen declined to provide his own name and indicated that he would not be willing to identify the man he had seen, but noted that the dispatcher would have his cell phone number. *Id.*

Around 1:47 PM, Officers located the abandoned Avalanche on General Hodges Street in what the government describes as "a high crime area in Southeast Albuquerque."[3] Gov't Ex. 3 at 3; Doc. 39 at 4. Around the same time, the Concerned Citizen approached an officer named Lieutenant Amy Sedler in person and identified himself.[4] Gov't Ex. 6 at 6:59. The Concerned Citizen reiterated that he had seen a shirtless man in blue shorts. *Id.* Additionally, he reported that a "gentleman over there" had seen the man exit an SUV,[5] take off running, return in a van, exit that van, stash something in the bushes, and then later retrieve that item.[6] *Id.* at 7:27. The

---

[3] At the suppression hearing, Commander Rene Barraza testified that the area is sometimes referred to as "the War Zone" or "the International District." H'rg Tr. at 32:2–4.

[4] While it appears that the Concerned Citizen told Lieutenant Sedler his name, the name itself is not discernable from Lieutenant Sedler's lapel video. Gov't Ex. 6 at 2:30. Neither Lieutenant Sedler nor Commander Barraza, who also interacted with the Concerned Citizen, could recall the Concerned Citizen's name at the suppression hearing. H'rg Tr. at 26:2–3, 46:23–25, 47:1. While Commander Barraza could not remember whether the Concerned Citizen gave both his first and last names, Lieutenant Sedler believed that he had given just a first name. *Id.* at 27:5–7, 64:18–19. Lieutenant Sedler never took down the Concerned Citizen's name. *Id.* at 65:2–3.

[5] At this point, the Concerned Citizen gestured in the direction of the Avalanche, but it is not clear from the lapel video if he was precisely identifying the Avalanche. Gov't Ex. 6 at 7:30.

[6] Notably, the Concerned Citizen did not provide any identifying details about the "gentleman." At the hearing, Lieutenant Sedler reported that while the Concerned Citizen "pointed behind him" when referencing the "gentleman," she "did not see anybody visible at that time" and that law enforcement were "never able to identify him." H'rg Tr. at 48:18–20, 56:22–25.

Additionally, the Concerned Citizen did not explicitly specify what he—as opposed to the "gentleman"—observed firsthand. However, the Concerned Citizen's report suggested that his firsthand observations began when the man retrieved the object from the bushes. Gov't Ex. 6 at

Concerned Citizen also reported that the man had something wrapped in a black shirt, which was "big enough to be a gun." *Id.* at 8:10; Gov't Ex. 7 at 8:09. Finally, he stated that his father was currently following the man, who was now located near a cement truck outside of B&D industries. Gov't Ex. 6 at 6:59.

Around 1:52 PM, an officer named Sergeant Jonathan Mares, who was on the scene with the Avalanche, got into his vehicle with the intention of reporting to a gas station, where he had seen a man in blue shorts and black shirt. *Id.* at 7:57, 8:23; Gov't Ex. 8 at 4:40. Before he left for the gas station, however, Lieutenant Sedler asked him to "check down Trumbull" and informed him that the suspect was *not* wearing a shirt, to which Sergeant Mares replied, "no shirt?" Gov't Ex. 8 at 4:40. She responded, "yeah he said no shirt." Gov't Ex. 6 at 8:35. Sergeant Mares then drove off. Gov't Ex. 8 at 5:05. Shortly thereafter, Lieutenant Sedler radioed him and stated, "hey, Johnny, this guy has the dad on the phone who's real-time following the guy, so I would go with his 49."[7] *Id.* at 9:41.

Just a few minutes earlier, the Concerned Citizen and Commander Rene Barraza had gone to inspect the bushes the Concerned Citizen had previously mentioned. Gov't Ex. 7 at 8:12. As they were inspecting bushes and cacti, the Concerned Citizen spoke by phone with his father, who he reported was in a white truck following the suspect, who was now walking north on Moon Avenue, wearing the black shirt he was previously carrying. *Id.* at 9:02. At 1:54 PM, Commander Barraza radioed and stated, in reference to the suspect, "I guess he put the black t-shirt back on."

---

7:22 ("So the gentleman over there saw him exit this SUV, took off running, came back with this van, exited this van, came down here, stashed something on the side of that red truck, *when I came back out of my office*, he was retrieving it, went down that way." (emphasis added)).
[7] At the hearing, Lieutenant Sedler explained that "49" is shorthand for "information." H'rg Tr. at 54:4–5.

*Id.* at 10:43. The radio message was comprehensible on Sergeant Mares' radio. Gov't Ex. 8 at 6:45.

Around 1:54 PM, Sergeant Mares, still driving, came upon Mr. Ramirez and called in to describe that he could see a "man wearing glasses, black shoes, black basketball shorts, bald." *Id.* at 7:20; Gov't Ex. 4 at 4. Mr. Ramirez—who appears to have had a shaved head—was across the street, walking north on Moon Avenue in a grey t-shirt, black basketball shorts, black backpack, and glasses. Gov't Ex. 8 at 8:33. At this point, he was outside of the perimeter that officers had established with respect to Mr. Lucio (one of the two men who reportedly abandoned the Avalanche). Def. Ex. A.

A short distance away, a man in a white truck (presumably the Concerned Citizen's father) called out to another officer—Sergeant Gregory Doose—"[*inaudible*] black shorts."[8] Gov't Ex. 9 at 25:00. Sergeant Doose responded, "that's him?" *Id.* The man replied, "careful, he's got something in his arms."[9] *Id.* at 25:04. Sergeant Doose then radioed Sergeant Mares that he was down the street and would "82" him and that "the guy in the white truck told me that that's the subject who has been running from 34's." *Id.* at 25:18. Sergeant Doose then began walking—and then running—towards Sergeant Mares. *Id.* at 25:18, 25:45. Notably, at the time that Sergeant Doose radioed Sergeant Mares (1:55:58 PM), Sergeant Mares was already exiting his vehicle to approach Mr. Ramirez, and Sergeant Doose's radio message is not audible in Sergeant Mares'

---

[8] The government asserts that the man in the white truck said, "that's him in the black shorts," and the defense asserts that he said, "that dude in the black shorts." Doc. 39 at 6; Doc. 35 at 2. The Court was not able to determine the man's precise words from Sergeant Doose's lapel footage.

[9] At the suppression hearing, Sergeant Doose testified that the man said, "Be careful. He has a gun." H'rg Tr. at 77:13. However, Sergeant Doose's lapel video does not document any such statement. Gov't Ex. 9 at 25:00.

lapel video.  Gov't Ex. 9 at 25:10; Gov't Ex. 8 at 8:20.  The lapel footage thus suggests that Sergeant Mares never received Sergeant Doose's radio call.

At 1:55 PM—just before Sergeant Doose's arrival—Sergeant Mares exited his vehicle and moved quickly towards Mr. Ramirez, with his arms swinging visibly in the lapel footage.  Gov't 8 at 8:12.  Sergeant Mares' lapel footage depicts Mr. Ramirez slowly walking on the sidewalk while looking down at a cell phone, with a liquor bottle wedged inside his left elbow.  *Id.* at 8:33.  At the suppression hearing, Sergeant Mares testified that Mr. Ramirez's demeanor was "passive" and that Mr. Ramirez was walking and not out of breath.  H'rg Tr. at 116:17–23.



The following exchange ensued as Sergeant Mares moved towards Mr. Ramirez:

| | |
|---|---|
| Sergeant Mares: | Hello sir, Albuquerque Police Department.  Hi.  How are you? |
| Mr. Ramirez: | I'm good. |
| Sergeant Mares: | I'm going to talk to you for a minute, okay? |
| Mr. Ramirez: | What did I do? |
| Sergeant Mares: | You've been identified as someone who was possibly involved in a crime, okay? |

Gov't Ex. 8 at 8:28.  Sergeant Mares then reached out and grabbed Mr. Ramirez's arm.  *Id.* at 8:36. The encounter continued:

| | |
|---|---|
| Sergeant Mares: | Don't reach in your pockets, don't go into anything ok?  So what's going to happen you're gonna be placed in handcuffs, okay? |
| Mr. Ramirez: | Why? |
| Sergeant Mares: | Because I told you your reference to a crime [sic]. |
| Mr. Ramirez: | What did I do though? |
| Sergeant Mares: | Okay?  We're gonna figure that all out, okay? |
| Mr. Ramirez: | Fuck man. |
| Sergeant Mares: | Okay? |
| Mr. Ramirez: | Are you serious? |
| Sergeant Mares: | Yeah, I'm dead serious. |
| Mr. Ramirez: | That's bullshit man . . . |
| Sergeant Mares: | So you're gonna be placed in handcuffs. |
| Mr. Ramirez: | . . . You guys got the wrong person, man. |
| Sergeant Mares: | Well I don't know that, okay?  So that's what we're going to do, okay? |

| | |
|---|---|
| Mr. Ramirez: | That's fucked up, man. |
| Sergeant Mares: | We're gonna have this officer come up and get your bottle so it doesn't fall on the floor—make sense?  You're not gonna reach in your pockets, you're not going to go for anything—make sense?  I don't want to have to use force on you.  Hold on, hold on I don't want you reaching in your pocket, I see that magazine in your pocket, I don't want you reaching for anything—make sense? |

*Id.*  At this point, Sergeant Doose arrived at Mr. Ramirez's person and stated, "I'm going to put you in handcuffs right now, okay?  Just cooperate with us, alright?"  *Id.* at 9:09.  In response, Mr. Ramirez began pulling away from the officers and yelling for them to shoot him.  *Id.* at 9:16. Together, the officers took him to the ground, where they instructed him to roll onto his stomach—a command he refused.  *Id.* at 9:35.  Mr. Ramirez stated that he would not stop resisting because he was not going back to prison.  *Id.*  Officers eventually removed a firearm from Mr. Ramirez's right pocket and handcuffed him.  *Id.* at 11:12.

## II.    Procedural Background

On August 25, 2021, Mr. Ramirez was charged by indictment with one count of Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924.  Doc. 17.  He pled not guilty at an arraignment held on September 1, 2021.  Doc. 20.  On December 6, 2022, Mr. Ramirez filed the instant Motion to Suppress, in which he asks the Court to suppress the firearm recovered from the search of his person on July 26, 2021, because Sergeant Mares violated his Fourth Amendment rights when he seized him based on an anonymous tip insufficient to establish reasonable suspicion.  *See generally* Doc. 35.  The government responds that (1) the moment of seizure did not take place until Sergeant Mares physically restrained Mr. Ramirez, (2) at that time, officers had reasonable suspicion, including that several crimes had transpired, and (3) suppression is inappropriate due to the existence of an intervening crime (resisting arrest).  *See*

*generally* Doc. 39.  The defense filed a reply on January 25, 2023.  Doc. 43.  On June 21, 2023,

this Court held an evidentiary hearing on Mr. Ramirez's motion, where it heard testimony from

Commander Barraza, Lieutenant Sedler, Sergeant Doose, and Sergeant Mares.

## DISCUSSION

The defense's Motion to Suppress raises several questions: (1) at what point did Sergeant

Mares seize Mr. Ramirez, (2) did reasonable suspicion support that seizure, and (3) if not, is

suppression the appropriate remedy?  The Court has reviewed the parties' briefs, the testimony

and exhibits presented at the June 21, 2023 hearing, and the relevant Fourth Amendment law.  For

the reasons explained below, the Court finds that Sergeant Mares seized Mr. Ramirez the moment

he approached and began speaking to him, that seizure was not supported by reasonable suspicion,

and Sergeant Mares' violation of Mr. Ramirez's Fourth Amendment rights requires suppression

of the firearm found on his person.

### I.    Seizure

Whether suppression is merited depends upon *when* Sergeant Mares seized Mr. Ramirez.

As explained below, the Court finds that Sergeant Mares seized Mr. Ramirez at the moment he

approached and began speaking to him on July 26, 2021.

The Fourth Amendment protects "the right of the people to be secure in their . . . effects,

against unreasonable searches and seizures," U.S. Const. amend. IV, including unreasonable

investigatory stops or detentions.  *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012)

(citations omitted).  However, not all encounters between police officers and citizens involve

seizures within the meaning of the Fourth Amendment.  *Florida v. Bostick*, 501 U.S. 429, 434

(1991).  Instead,

> [t]he Supreme Court has recognized three types of police-citizen encounters: (1)
> consensual encounters which do not implicate the Fourth Amendment; (2)

> investigative detentions which are Fourth Amendment seizures of limited scope and
> duration and must be supported by a reasonable suspicion of criminal activity; and
> (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only
> if supported by probable cause.

*United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009) (citations and internal quotations omitted). The Supreme Court has further explained that a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Bostick*, 501 U.S. at 434.

Police officers do not implicate the Fourth Amendment by posing questions, asking for identification, or requesting consent to search, even when they have no particular reason to suspect an individual has violated the law. *United States v. Easley*, 911 F.3d 1074, 1079 (10th Cir. 2018) (citing *United States v. Drayton*, 536 U.S. 194, 200–01 (2002)). However, a seizure does occur where a reasonable person would not feel free to terminate the encounter. *Drayton*, 536 U.S. at 201; *see also United States v. Hernandez*, 847 F.3d 1257, 1266 (10th Cir. 2017) ("[A]n individual is 'seized' when he has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way." (citing *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999))). Courts assess whether a person would feel free to terminate an encounter from the perspective of the objective, reasonable person and by evaluating the totality of the circumstances. *Easley*, 911 F.3d at 1079 (citations omitted).

In *Bostick*, the Supreme Court recognized the following non-exhaustive factors as relevant in assessing whether a reasonable person would feel free to terminate a police encounter: (1) whether the agent advised the individual that he had the right to refuse consent, (2) whether the agent in any way threatened the individual (*i.e.*, the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter. 501 U.S. at 437. In addition to the

factors set forth in *Bostick*, the Tenth Circuit has also articulated its own non-exhaustive list for consideration in determining whether a seizure has occurred:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

*Jones*, 701 F.3d at 1313 (citing *United States v. Rogers*, 556 F.3d 1130, 1137–38 (10th Cir. 2009)). Courts may also consider whether an officer indicated that the person was free to leave. *Id.* However, "no single factor is dispositive." *Id.* Additionally, the factors are not exhaustive, and the Court may consider other relevant factors. *Hernandez*, 847 F.3d at 1264. Because the seizure analysis is an objective one, subjective characteristics—such as how the accused's race might shape his reaction to police—are not permissible considerations. *Easley*, 911 F.3d at 1082.

Here, the Court finds that Sergeant Mares seized Mr. Ramirez the moment he first approached and spoke to him. When Sergeant Mares began speaking to Mr. Ramirez, he was moving towards him with urgency—his arms swinging through the air[10]—in uniform, from a marked police car. Gov't Ex. 8 at 8:24; H'rg Tr. at 93:11–12 ("I was wearing my police uniform, displaying my badge of office."). In a firm tone, he identified himself as a member of the Albuquerque Police Department and said, "I'm going to talk to you for a minute, okay?" Gov't Ex. 8 at 8:24. When Mr. Ramirez asked what he had done, Sergeant Mares responded, "you've been identified as someone who was possibly involved in a crime." *Id.* at 8:33.

---

[10] At the suppression hearing, Sergeant Mares testified that he approached Mr. Ramirez at "a normal walking speed." H'rg Tr. at 93:14–15, 22. However, his lapel footage contravenes that contention. While the lapel video does not depict him running, his arms appear swinging in the air, suggesting that he was vigorously walking at an above-average speed.

While the government concedes that a seizure took place when—moments later—Sergeant Mares placed his hands on Mr. Ramirez, the evidence supports that the seizure preceded the physical touch. Doc. 39 at 12. In particular, two factors that the Tenth Circuit identified in *Jones* are relevant here: (1) the absence of members of the public, and (2) Sergeant Mares' language and tone. 701 F.3d at 1313. Additionally, Sergeant Mares' testimony at the suppression hearing established his intent to detain Mr. Ramirez the moment he exited his vehicle. H'rg Tr. at 108:6–12.

First, the fact that Sergeant Mares approached Mr. Ramirez on an empty street—with apparently no other individuals in view—supports the existence of a seizure. The Tenth Circuit has explained that "the Supreme Court and our Court have placed great weight on location—concluding encounters in the presence of others are more likely to be consensual than encounters where no members of the public are present." *United States v. Armando Martinez*, 792 F. App'x 610, 613 (10th Cir. 2019) (citing *Drayton*, 536 U.S. at 204; *Hernandez*, 847 F.3d 1265). The absence of other people is important even where the encounter happens in public. In rejecting the government's contention that "whether anybody is around to see the questioning is irrelevant as long as the questioning occurs in a public place," the Tenth Circuit instead held that, "[o]ur cases view police-citizen interactions in nonpublic places and police-citizen interactions in the absence of other members of the public similarly." *Hernandez*, 847 F.3d at 1265. Here, the fact that the initial encounter between Sergeant Mares and Mr. Ramirez appears to have taken place without any visible witnesses supports the existence of a seizure.

Second, Sergeant Mares' initial approach of Mr. Ramirez—in which he immediately asserted, "I'm going to talk to you for a minute, okay?"—was accusatory in both tone and language. Gov't Ex. 8 at 8:24. While the statement was technically phrased as a question, the

Court finds that an objective, reasonable person would interpret such a forceful statement from a uniformed officer as leaving no room to decline. Sergeant Mares' next statement—that Mr. Ramirez had been "identified as someone who was possibly involved in a crime"—only reinforced that Mr. Ramirez was a suspect under questioning and not free to leave. *Id.* Importantly, Sergeant Mares made these statements while moving towards Mr. Ramirez with urgency. *See supra* n.10. And the fact that Mr. Ramirez stopped walking (and verbally responded) the moment Sergeant Mares approached him further supports that he did not, in fact, feel free to leave. Gov't Ex. 8 at 8:28; H'rg Tr. at 116:24–25, 117:1 ("Q. Did he stop when you talked to him? A. Yes."); *see United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) ("When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen *submit[s] to the assertion of authority*." (emphasis added) (internal quotations omitted).

In *Jones*, the Tenth Circuit identified "aggressive language or tone of voice by an officer indicating compliance is compulsory" as one factor relevant to the seizure inquiry. 701 F.3d at 1313. More specifically, the Tenth Circuit noted that "the accusatory nature of [a] Sergeant['s] very first statement . . . would have been somewhat jolting to a reasonable person." *Jones*, 701 F.3d at 1314; *compare United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006) (finding no seizure where "[t]he request was phrased as a question and spoken in an ordinary tone of voice."). Here, the accusatory nature of Sergeant Mares' statement ("I'm going to talk to you for a minute . . . you've been identified as someone who was possibly involved in a crime") and tone lend support to the existence of a seizure.

Finally, Sergeant Mares' testimony at the suppression hearing made clear that he intended to seize Mr. Ramirez the moment he stepped out of his vehicle and moved towards Mr. Ramirez.

At the hearing, Sergeant Mares agreed that when he exited his vehicle, his intention was to detain Mr. Ramirez.[11]  H'rg Tr. at 108:6–12.  In fact, he asserted that he got out of his vehicle for the *purpose* of detaining Mr. Ramirez.  *Id.* ("Q. Okay.  That was your intention.  That's why you got out of the car?  A. Correct.").  While Sergeant Mares did not agree that he would have stopped Mr. Ramirez if, in an alternative hypothetical, he had fled, Sergeant Mares indicated that in such an instance he could have "extended the perimeter . . . to get more officers there" with the ultimate goal of detaining him.  *Id.* at 109:15–24.  Sergeant Mares' testimony thus confirmed that he exited his vehicle with the purpose of detaining Mr. Ramirez.

In light of Sergeant Mares' testimony, it is unsurprising that he never told Mr. Ramirez he could refuse to speak with him.  *Bostick*, 501 U.S. at 437.  While the remaining *Jones* factors are not present here, "no single factor is dispositive" in the seizure analysis.  701 F.3d at 1313.  The Court finds that under the totality of the circumstances, Sergeant Mares' language, tone, and testimony—combined with the location of the confrontation—collectively establish that a seizure occurred the moment Sergeant Mares approached and began speaking to Mr. Ramirez.

## II.    Reasonable Suspicion

Next, the existence of reasonable suspicion depends on the information available to Sergeant Mares—and the reliability of that information—at the moment of seizure.  Examining

---

[11] Specifically, during cross-examination, Sergeant Mares agreed to the following:

> Q. Now, when you approached Mr. Ramirez, the moment that you get out of your car, you're going to detain Mr. Ramirez, correct?
> A. Yes.
> Q. Okay.  That was your intention.  That's why you got out of the car?
> A. Correct.

H'rg Tr. at 108:6–12.  Later, on re-direct, Sergeant Mares testified that at the time he arrived at the scene: "I decided I was going to talk to him.  I was going to, you know, detain him to talk to him." H'rg Tr. at 113:19–20.

the totality of the circumstances, the Court finds that Sergeant Mares lacked reasonable suspicion based on the incongruity between the suspect description and Mr. Ramirez's appearance as well as the limited reliability of the reports regarding the suspect's location.

An investigatory detention, commonly known as a "*Terry* Stop" pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004) (internal citations omitted). A detention is "justified at its inception" where an officer has reasonable suspicion of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). While "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard," reasonable suspicion requires "more than a hunch." *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013) (citations and internal quotations omitted). However, "[a]s long as [the detaining officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." *Id*.

Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). In assessing "the reasonableness of the officer's suspicions," courts use "an objective standard taking the totality of the circumstances and information available to the officers into account." *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008) (quoting *Johnson,* 364 F.3d at 1189).

With respect to tips from anonymous informants, the Supreme Court has held that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Florida v. J.L.*, 529

U.S. 266, 270 (2000) (internal quotations omitted).  In determining whether sufficient indicia of reliability support an anonymous tipster, the Tenth Circuit has pointed courts to several factors, including:

> (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011).  This inquiry is "case-specific" and "no single factor is dispositive." *Id.*

Other "[r]elevant considerations include whether the officers corroborated details of the tip, such as the informant's 'basis of knowledge' and 'veracity.'" *Donahue v. Wihongi*, 948 F.3d 1177, 1189 (10th Cir. 2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 241 (1983)).  Additionally, the Tenth Circuit has noted that "[f]ace-to-face informants generally are more reliable than anonymous informants because they 'allow[ ] the police an opportunity to evaluate [their] credibility and demeanor.'" *Id.* (quoting *Sanchez*, 519 F.3d at 1213).

In assessing an informant's anonymity, courts have found a person sufficiently identifiable even where law enforcement did not know the person's name.  *See, e.g.*, *United States v. Saulsberry*, 878 F.3d 946, 950 (10th Cir. 2017) ("although the caller did not provide his name, he sufficiently identified himself to establish his status as a citizen informant . . . the caller identified himself as an employee of the business where Defendant parked his car."); *United States v. Conner*, 699 F.3d 1225, 1229 (10th Cir. 2012) ("the caller did not disclose his name but provided enough information to render himself readily identifiable—he gave the operator his phone number and address"); *United States v. Brown*, 496 F.3d 1070, 1076 (10th Cir. 2007) ("Although the police

did not know the caller's name here, they knew enough about him to reasonably believe they could locate him had his call been simply intended to harass Mr. Brown.").

Here, the question is whether Sergeant Mares' detention of Mr. Ramirez was "justified at its inception," or, in other words, whether he had reasonable suspicion to detain Mr. Ramirez when he approached him on the street. *Johnson*, 364 F.3d at 1189. The existence of reasonable suspicion hinges upon two considerations, addressed in turn below: the information Sergeant Mares possessed and the reliability of that information.

### a. Information Known to Sergeant Mares

At the time Sergeant Mares approached Mr. Ramirez, he had two relevant pieces of information: descriptions of the suspect's (1) appearance and (2) general location.

First, with respect to the suspect's appearance, Sergeant Mares appears to have been aware of the Concerned Citizen's report that the suspect was a "Spanish" individual with blue shorts, black shirt, and arm tattoos.[12] Gov't Ex. 3 at 2. Thus, at the time Sergeant Mares observed Mr. Ramirez, he was operating based on information that the suspect was wearing *blue* shorts, a *black* shirt, and *had* arm tattoos. In contrast, he encountered Mr. Ramirez with *black* shorts, a *grey* shirt, and *no* visible arm tattoos. While it seems reasonable that an officer in Sergeant Mare's position might not discern the difference between blue and black shorts, Sergeant Mares specifically

---

[12] Notably, up until the minute prior to encountering Mr. Ramirez, the information Sergeant Mares had from Lieutenant Sedler was that the suspect was *not* wearing a shirt. Gov't Ex. 8 at 4:40. More specifically, at 1:54 PM, one minute prior to encountering Mr. Ramirez, he received a radio call from Commander Barraza stating, "I guess he put the black t-shirt back on." *Id.* at 6:45. While it is not entirely clear that Sergeant Mares registered that information, which significantly changed the suspect description, the Court will assume that Sergeant Mares understood he was looking for someone in a black shirt based on Commander Barraza's radio call.

radioed that he saw a man in "*black* basketball shorts," suggesting that he understood the difference.[13]  Gov't Ex. 8 at 7:10 (emphasis added).

Of further note, the man Sergeant Mares encountered was bald and wearing glasses—characteristics so striking that Sergeant Mares immediately called them in via radio.  Gov't Ex. 8 at 7:20 (stating "man wearing glasses, black shoes, black basketball shorts, bald" upon encountering Mr. Ramirez).  Yet the evidence does not document that the Concerned Citizen, his father, or any other witness described the suspect as bald or wearing glasses.  The absence of such descriptors—which are substantially more distinctive than clothing color—raises serious questions about whether Mr. Ramirez matched the suspect description.  The Court further notes that the Concerned Citizen's description of the suspect wearing basketball shorts did little to distinguish him from the vast numbers of people wearing shorts in late July in Albuquerque.  *Cf.  United States v. Grant*, No. CR 05-2511 JB, 2006 WL 1305037, at *6 (D.N.M. Apr. 10, 2006) ("General profiles that fit large numbers of innocent people do not establish reasonable suspicion." (citing *United States v. Yousif,* 308 F.3d 820, 828 (8th Cir. 2002)).  Taken together, the fact that Mr. Ramirez did not display *any* of the suspect descriptors (blue shorts, black shirt, or arm tattoos) and instead bore a distinct appearance (bald, glasses) that witnesses never mentioned undermines the existence of reasonable suspicion.  In other words, the incongruity between the description Sergeant Mares possessed and the man he observed suggests that Sergeant Mares lacked reasonable suspicion to detain Mr. Ramirez.

---

[13] At the hearing, Sergeant Mares refused to agree that Mr. Ramirez was wearing a grey shirt, insisting instead that "it could appear black," but did agree that Mr. Ramirez's shirt was lighter in color than his black shorts.  H'rg Tr. at 106:10–17.  The Court finds that in the lapel video, Mr. Ramirez's shirt clearly appears grey in color.

Second, Sergeant Mares also possessed information about the suspect's location. Specifically, Lieutenant Sedler had requested that Sergeant Mares check "down Trumbull" in the area where the father (via the Concerned Citizen) reported the suspect was walking.  Gov't Ex. 6 at 8:23.  Commander Barraza had likewise radioed Sergeant Mares that the suspect was "walking northbound on Moon from Trumbull."  Gov't Ex. 7 at 9:15; Gov't Ex. 8 at 5:17.  It appears that Sergeant Mares apprehended Mr. Ramirez at Moon Street and Bell Avenue (about one block north of Trumbull), in the approximate area that the father had reported.  Doc. 39 at 7.

However, the father's report was not the only locational information available to law enforcement.  In the Concerned Citizen's earlier interactions with law enforcement, he initially reported that the suspect—who he observed on General Hodges Street heading south towards Susan Avenue—was running *west* on Susan.  Gov't Ex. 5 at 0:48.  If the suspect had, in fact, run west, he would have ended up in the opposite direction of the location in which Sergeant Mares apprehended Mr. Ramirez, which was *east* of General Hodges Street.  Of further note, the gas station where Sergeant Mares reported having seen an individual in blue shorts and black shirt was one block *west* of General Hodges.  H'rg Tr. at 98:24.  Thus, while the father's report about the suspect's location appears to have matched the area where Sergeant Mares found Mr. Ramirez, that information conflicted with an earlier report from the Concerned Citizen, raising questions about the accuracy of the location information.

### b.  Reliability

The Court next addresses the reliability of the information underlying Sergeant Mares' decision to detain Mr. Ramirez.  *White*, 496 U.S. at 330 ("Reasonable suspicion . . . is dependent upon both the content of information possessed by police *and its degree of reliability*." (emphasis added)).  Because both the Concerned Citizen and his father offered anonymous tips, the Court

examines their reliability under the factors set forth in *Chavez*. As explained below, the Court finds that the Concerned Citizen's statements to law enforcement have mixed reliability, and that information from his father was not reliable.

### i. Whether the informant lacked "true anonymity"

The first *Chavez* factor guides courts to examine the extent to which an informant was "truly anonym[ous]," including "whether the police knew some details about the informant or had means to discover them." 660 F.3d at 1222. Here, the Concerned Citizen was not wholly anonymous to law enforcement. While he initially refused to give his name, he eventually provided at least his first name to Lieutenant Sedler. *See supra* n.4. Additionally, the Concerned Citizen provided his business address and indicated that the area in which he had seen the suspect was "right here in front of [his] shop," giving law enforcement a strong sense of where he worked. Gov't Ex. 5 at 1:15. The Tenth Circuit has previously deemed an informant identifiable where he provided his work location but no name. *See Saulsberry*, 878 F.3d at 950. Thus, the fact that the Concerned Citizen identified his place of work and first name minimizes his anonymity.

On the other hand, the Concerned Citizen's *father's* identity is far from clear. While theoretically law enforcement might have been able to locate the father through the Concerned Citizen, the connection is tenuous. Other than Sergeant Doose's fleeting interaction with the father (who was in a car across the street), the father had no direct interactions with any officers. *Cf. Donahue*, 948 F.3d at 1189 ("[f]ace-to-face informants generally are more reliable than anonymous informants because they 'allow[ ] the police an opportunity to evaluate [their] credibility and demeanor.'" (quoting *Sanchez*, 519 F.3d at 1213)). Because law enforcement did not directly interact with the father, they lacked the ability to assess his "veracity" or his "basis of knowledge." *Cf. id.* (citing *Gates*, 462 U.S. at 241). For instance, they had no details regarding

20

his age, mental state, distance from the suspect, whether he saw the initial shooting occur, or whether he observed the suspect exit the Avalanche—factors that would inform the reliability and basis of his report. Overall, the dearth of information regarding the father, who communicated with officers second-hand through his son in a literal game of telephone, raises serious questions about the reliability of the information he tendered.

*ii. Whether the informant reported contemporaneous, firsthand knowledge*

The next *Chavez* factor examines the extent to which the informant's report was contemporaneous and firsthand. 660 F.3d at 1222. Both the Concerned Citizen and his father purported to make contemporaneous reports based on their own perceptions. Upon calling 911, the Concerned Citizen indicated that the suspect was "right here in front of [his] shop," suggesting that his perception of the suspect was contemporaneous. Gov't Ex. 5 at 1:15. Likewise—at least according to the Concerned Citizen—his father was relaying his contemporaneous impressions to his son while following the suspect in his car. Gov't Ex. 6 at 9:33; Gov't Ex. 7 at 8:37. The fact that both men alleged to be sharing real-time information lends supports to their reliability. *Conner*, 699 F.3d 1229 ("the caller's immediate, firsthand knowledge added to the reliability of his statements.").

On the other hand, however, it is difficult to evaluate the reliability of both witnesses' supposedly contemporaneous reports, and other evidence calls their perceptions into question. First, the Concerned Citizen made confusing reports about what he himself observed, suggesting that part of what he relayed to officers was based on the observations of an unidentified "gentleman." Specifically, he reported:

> So the gentleman over there saw him exit this SUV, took off running came back with this van, exited this van, came down here, stashed something on the side of that red truck, when I came back out of my office, he was retrieving it, went down that way, and my dad said he just saw him right here by B&D industries.

21

Gov't Ex. 6 at 6:59.  Critically, the references to what "the gentleman over there"—rather than what he—observed do not appear to have been firsthand, limiting their credibility.  As addressed above, the Concerned Citizen's own firsthand observations appear to have begun only after he "came back out of [his] office" and saw the suspect retrieve something before proceeding down the street.  *See supra* n.6.  Thus, it appears that the Concerned Citizen did not personally observe the suspect exit the "SUV" or Avalanche, making it far from clear that the person the Concerned Citizen saw on General Hodges Street was the same person who exited the Avalanche.[14]

Additionally, while the father reported to be following the suspect in real time, law enforcement did not directly observe him doing so.  Indeed, the only officer who interfaced directly with the father was Sergeant Doose, who did not get the man's name and spoke to him from across an intersection (which he estimated to be about 20 feet away).[15]  H'rg Tr. at 83:5–11, 84:13–14. Commander Barraza and Lieutenant Sedler both testified at the hearing that they did not know when the father began following the suspect or if he ever saw the suspect driving the Avalanche. *Id.* 36:22–25, 37:1–2; 69:3–11.  At the hearing, Sergeant Doose likewise agreed that he did not "know anything about this man in the truck."  *Id.* at 83:20–25.  Thus, while according to the Concerned Citizen, his father was providing first-hand contemporaneous information, with

---

[14] Lieutenant Sedler's lapel video documents two conversations with the Concerned Citizen.  The first is largely inaudible, but following the conversation, she informed Commander Barraza that "this guy is saying that he saw the guy exit this car."  Gov't Ex. 6 at 2:35.  In their second conversation, however, the Concerned Citizen asserted that it was the "gentleman" who saw the suspect exit "this SUV"—possibly in reference to the Avalanche.  *Id.* at 6:59.  At the hearing, Lieutenant Sedler testified that following their second conversation, she "took it as this person that's contacting me actually didn't see him exit the vehicle, like he said the first time.  It was this other gentleman, who's unidentified."  H'rg Tr. at 59:5–8.  The Court agrees that, based on the Concerned Citizen's fuller explanation to Lieutenant Sedler in their second conversation, it does not appear that the Concerned Citizen personally saw the suspect exit the Avalanche.
[15] Sergeant Doose testified that he intended to "come back to this guy and talk to him later" but never did.  H'rg Tr. at 83:10–11.

22

virtually no information about the father's identity or process, it is difficult to assess the veracity

of his report.  *Cf. Donahue*, 948 F.3d at 1189 (citing *Gates*, 462 U.S. at 241).

> iii.  *Whether the informant provided detailed information about the events observed*

The third *Chavez* factor assesses the informant's level of detail.  660 F.3d at 1222.  Here,

both the Concerned Citizen and his father gave relatively detailed reports.  When speaking with

Lieutenant Sedler in person, the Concerned Citizen gave a specific account of what he observed

the suspect doing.  *Cf. Conner*, 699 F.3d 1230 ("the caller provided specific details about what he

had heard and seen . . .  The number and precision of these details added to the tip's reliability.").

In addition to physically describing the suspect (specifying that he had blue shorts, no shirt, tattoos,

and was carrying something in a black shirt), he shared details about the suspect retrieving

something from the bushes before leaving General Hodges Street.  Gov't Ex. 6 at 6:59.  His father

also provided relatively detailed information about the suspect, including his location and that he

was now wearing a shirt.  Overall, the third *Chavez* factor tends to support reliability.

> iv.  *The informant's stated motivation for reporting the information*

Fourth, *Chavez* instructs courts to examine an informant's stated motivation for sharing

information.  660 F.3d at 1222.  As the defense points out, the Concerned Citizen did not identify

any motive for reporting information about the suspect.  Doc. 35 at 8.  It is thus possible, as the

defense suggests, that he might have "wanted the police to make an arrest so law enforcement

would stop patrolling his neighborhood," because "he wanted to throw the officers off his [own]

trail," or because he "held a grudge against Mr. Ramirez and wanted to get him in trouble."  *Id.*

However, the Tenth Circuit has found that even where an anonymous informant "did not explicitly

state his motivation for reporting the information," the fact that he shared his name and address

"suggests that he was acting as a concerned citizen rather than a 'malicious tipster.'"  *Cf. Conner*,

699 F.3d 1230.  Thus, the fact that the Concerned Citizen gave some identifying information (the location of his place of work and at least his first name) suggests that his motivation was not likely malicious.  However, because his father did not directly provide law enforcement with any identifying information, his motivations are not discernable, limiting his reliability in this respect.

     *v. Whether the police were able to corroborate information provided by the informant*

Lastly, *Chavez* guides courts to examine the extent to which law enforcement corroborates an informant's report.  660 F.3d at 1222.  Here, the Concerned Citizen's description of the suspect (blue shorts, black shirt, arm tattoos) did not comport with Mr. Ramirez's actual appearance (black shorts, grey shirt, and no visible arm tattoos).  *See supra* pp. 17–18.  In contrast, the father's report regarding location and the suspect wearing a shirt matched the circumstances Sergeant Mares encountered.  Thus, this final factor militates against the Concerned Citizen's reliability but provides support for the father's reliability.

On the whole, the factors outlined in *Chavez* provide mixed support for the Concerned Citizen's reliability.  However, as addressed *supra* pp. 17–18, even viewing the Concerned Citizen as reliable, the incongruity between the Concerned Citizen's description and Mr. Ramirez's presentation undercuts the existence of reasonable suspicion.  In other words, while the Concerned Citizen may have been reliable, the description he provided did not match the person whom Sergeant Mares detained.  In comparison, while the information the father supplied fit Mr. Ramirez's appearance and location, the father—who had no sustained in-person contact with officers and shared information only through his son—was even less reliable than his son, undermining the reliability of those reports.  Under the totality of the circumstances, the incongruity between the Concerned Citizen's report and Mr. Ramirez's appearance as well as the

father's minimal reliability establish that Sergeant Mares lacked reasonable suspicion to detain Mr. Ramirez.

Finally, the government alleges that at the moment Sergeant Mares seized Mr. Ramirez, he had reasonable suspicion that Mr. Ramirez had committed several crimes, including carrying a firearm while under the influence of alcohol, carrying a concealed handgun, and public consumption of alcohol. Doc. 39 at 15 (citing N.M. Stat. Ann. §§ 30-7-4 (A)(2), 30-7-2 and New Mexico Code of Ordinances § 12-4-8), 18. These arguments are unavailing. With regard to the firearm crimes, there is no evidence that Sergeant Mares had seen the firearm before he placed his hands on Mr. Ramirez. Instead, it was only *after* he grabbed Mr. Ramirez (at 1:56:23 PM) that he stated, "I see that magazine in your pocket" (at 1:56:56 PM). Gov't Ex. 8 at 8:37, 9:09. At that point, he had already detained Mr. Ramirez. *See supra* at pp. 12–14. Indeed, at the hearing, Sergeant Mares testified that when he first saw the magazine, he had already told Mr. Ramirez that he was going to talk to him and that Mr. Ramirez was not free to leave at that point.[16] H'rg Tr. at 111:7–14. Beyond the magazine—which Sergeant Mares did not observe until after detaining Mr. Ramirez—there were no other indications that Mr. Ramirez, who was outside the perimeter

---

[16] Specifically, Mr. Ramirez testified as follows:

> Q. Where were you when you first saw [the magazine]?
> A. I was pretty close to him.
> Q. Okay. You'd already told him that you were going to talk to him, correct?
> A. Correct.
> Q. He wasn't free to leave at that point, correct?
> A. With alcohol and a possible weapon in his pocket, no.
> Q. Okay. So at the time that you observed the weapon in his pocket, he wasn't free to leave?
> A. Correct.

H'rg Tr. at 111:5–14.

officers had established for the first suspect, might be armed.[17]  Thus, at the moment Sergeant

Mares detained Mr. Ramirez, he lacked reasonable suspicion of a firearms-related offense.[18]

Likewise, with respect to the open container, there is no evidence that Sergeant Mares ever

observed Mr. Ramirez *drinking* from the alcohol container—a necessary element of public

consumption of alcohol.  *See* New Mexico Code of Ordinances § 12-4-8.  Likewise, Sergeant

Mares' lapel footage—which depicts Mr. Ramirez walking calmly and steadily while looking at

his phone—suggests that Mr. Ramirez's presentation gave no indications of intoxication.  Gov't

Ex. 8 at 8:13.  Simply observing Mr. Ramirez holding a bottle of alcohol would have been

insufficient to establish reasonable suspicion of public consumption of alcohol.  Moreover, while

Sergeant Mares' lapel footage shows that the bottle of alcohol was partially consumed and did not

appear to have a tamper seal or be corked, the footage strongly suggests that such details were not

visible to Sergeant Mares until *after* he detained Mr. Ramirez.  Specifically, the lapel footage

shows the bottle tucked into Mr. Ramirez's left arm—the side of his body that was facing away

(and thus out of sight) as Sergeant Mares approached him.  *Id.* at 8:30.  In the lapel footage, the

bottle does not become visible until *after* Sergeant Mares begins speaking to Mr. Ramirez—at

which point Sergeant Mares had already detained Mr. Ramirez.  *Id.* at 8:34; *see supra* pp. 12–14.

Because the fact that the bottle had been partially consumed was only visible after Sergeant Mares

---

[17] When speaking to Commander Barraza, the Concerned Citizen reported that the suspect had retrieved something that appeared "big enough to be a gun."  Gov't Ex. 7 at 8:12.  However, as addressed above, Sergeant Mares lacked reasonable suspicion to detain Mr. Ramirez based on the Concerned Citizen's report.  *See supra* pp. 17–18.  Consequently, even if Sergeant Mares had been aware of the Concerned Citizen's statement about an object "big enough to be a gun," he lacked reasonable suspicion that Mr. Ramirez was the suspect that the Concerned Citizen had described.
[18] The government asserts that, in light of the crime of investigation (a shooting), officers had reasonable suspicion "that [Mr. Ramirez] had committed a crime related to the active shooting incident."  Doc. 39 at 15.  However, without reasonable suspicion that Mr. Ramirez might be a suspect in the shooting, Sergeant Mares could not have had reasonable suspicion that Mr. Ramirez possessed a firearm in connection with the shooting.

detained Mr. Ramirez, it could not have provided reasonable suspicion for his decision to detain. Thus, Sergeant Mares lacked reasonable suspicion that Mr. Ramirez had publicly consumed alcohol at the moment he detained him.

## III.    Remedy

Having determined that Mr. Ramirez was illegally detained, the question becomes whether suppression of the firearm found on Mr. Ramirez's person is the appropriate remedy.  For the reasons described below, the Court finds that suppression is merited in this case.

Under the fruit of the poisonous tree doctrine, evidence discovered "as a result of a search in violation of the Fourth Amendment must be excluded." *Oregon v. Elstad*, 470 U.S. 298, 305–06 (1985) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).  The accused bears the initial burden of establishing a causal connection between an illegal seizure and the evidence he seeks to suppress. *United States v. Shrum*, 908 F.3d 1219, 1233 (10th Cir. 2018) (citing *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006)).  However, if the defense satisfies its obligation, the burden shifts to the government to establish that the incriminating evidence was discovered by means "sufficiently distinguishable from the initial illegality to be purged of the primary taint." *Shrum*, 908 F.3d at 1233 (citing *Wong Sun*, 371 U.S. at 488).  More specifically, if the government can demonstrate "inevitable discovery, discovery by independent means, or attenuation, the evidence is not fruit of the poisonous tree and need not be suppressed." *Torres-Castro*, 470 F.3d at 999.  As the Tenth Circuit has described, "[t]his is a heavy burden." *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010).  Here, the government argues that the attenuation doctrine renders suppression inapplicable.  Doc. 39 at 20.

In *Brown v. Illinois*, 422 U.S. 590 (1975), the Supreme Court identified three factors that guide a court's analysis of whether the taint of an initial Fourth Amendment violation was purged:

(1) the temporal proximity between the unconstitutional conduct and discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.* at 603–04; *see also Utah v. Strieff*, 579 U.S. 232, 239 (2016).

In *Fox*, the Tenth Circuit extrapolated on the application of the factors outlined in *Brown*. 600 F.3d at 1260–61. With respect to the second factor (intervening circumstances), the Tenth Circuit explained that the intervening event "must create a discontinuity between the illegal [seizure] and the consent such that the original illegality is weakened and attenuated." *Id.* at 1261 (quoting *United States v. Gregory,* 79 F.3d 973, 980 (10th Cir. 1996)). By way of illustration, the panel identified "carefully explaining a consent form and advising an individual of the right to withhold consent, release from custody, an appearance before a magistrate, or consultation with an attorney" as examples of intervening events. *Id.* (internal citations, quotation marks, and alterations omitted).

Regarding the third factor (purposeful and flagrant misconduct), the Tenth Circuit explained that such conduct

> is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

*Id*. (citation and internal quotation marks omitted).

The threshold question in determining whether evidence resulting from Sergeant Mares' seizure requires suppression is thus whether the defense has demonstrated a causal link between that seizure and the evidence. *Shrum*, 908 F.3d at 1233. Here, the defense asserts that "[b]ut for Officer Mares and Sergeant Doose seizing Mr. Ramirez without reasonable suspicion, officers would not have learned Mr. Ramirez's identity, searched his person, or found a firearm." Doc. 35

28

at 9.  The Court agrees: absent Sergeant Mares' seizure of Mr. Ramirez, he would not have located the firearm in his pocket.

Accordingly, the burden shifts to the government to "establish that the incriminating evidence was discovered by means 'sufficiently distinguishable from the initial illegality to be purged of the primary taint.'"  *Shrum*, 908 F.3d at 1233 (citing *Wong Sun*, 371 U.S. at 488).  In making such a determination, three factors are relevant: (1) the temporal proximity between the violation and discovery of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.  Below, the Court addresses each factor in turn.

*i.  The temporal proximity between the violation and discovery of the evidence*

Here, Sergeant Mares' seizure of Mr. Ramirez and discovery of the firearm occurred in rapid succession.  Specifically, Sergeant Mares approached Mr. Ramirez and indicated that he saw a weapon in his pocket ("I see that magazine in your pocket") within the course of a single minute.  Gov't Ex. 8 at 8:25, 9:09.  This factor thus cuts against attenuation.  *Cf. United States v. Gaines*, 918 F.3d 793, 801 (10th Cir. 2019) ("The first factor (temporal proximity) supports Mr. Gaines because the evidence was discovered only minutes after the seizure.").

*ii.  The presence of intervening circumstances*

The government argues that under the so-called "new crime exception," officers may constitutionally arrest—and search that person incident to arrest—if the person commits a new crime after an illegal stop.  Doc. 39 at 20–21.  Here, according to the government, Mr. Ramirez committed the state crime of resisting arrest following the seizure, granting Sergeants Mares and Doose lawful grounds to arrest and search him incident to arrest, thus rendering the firearm admissible.  *Id.* at 21 (citing NMRA, Crim. UJI 14-2215).

Several circuit courts have recognized such an exception.  *See, e.g.*, *United States v. Tab*, 259 F. App'x 684, 690 (6th Cir. 2007); *United States v. Awadallah*, 349 F.3d 42, 81 n.8 (2d Cir. 2003); *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997); *United States v. Bailey*, 691 F.2d 1009, 1016–17 (11th Cir. 1982).  Likewise, in a case involving an illegal home entry by law enforcement, the Tenth Circuit refused to suppress evidence where the accused committed a new crime (assaulting officers) in his home with the officers present.  *United States v. Waupekenay*, 973 F.2d 1533, 1537 (10th Cir. 1992).  The Court in *Waupekenay* reasoned that the accused no longer had a reasonable expectation of privacy when law enforcement were present, and stated that "whatever rationale is used, the result is the same: Evidence of a separate, independent crime initiated against police officers in their presence after an illegal entry or arrest will not be suppressed under the Fourth Amendment."  *Id.* at 1538.

On the other hand, courts have expressed concern about the "new crime exception," particularly where the new crime is resisting arrest.  *See, e.g.*, *United States v. Price*, No. CR 22-4 (JMC), 2022 WL 16713060, at *9 (D.D.C. Nov. 3, 2022) ("where the purported 'new' crime involves unexceptional flight or resisting arrest, the policy concerns tilt toward exclusion: the deterrence justifications for the exclusionary rule would be undermined if officers could use generic crimes like 'resisting arrest' to smuggle otherwise inadmissible evidence into court."); *Jones v. State*, 745 A.2d 856, 873 (Del. 1999) ("allow[ing] an officer, lacking reasonable suspicion to effect a stop or search that leads to an illegal arrest, to contend that evidence seized incident to that illegal arrest is admissible . . . would be a result reached by bootstrap analysis.").

However, regardless of the new crime exception's merit, it is inapplicable here.  Critically, Sergeant Mares discovered a firearm on Mr. Ramirez just *before* Mr. Ramirez began resisting arrest.  At 1:56 PM, Sergeant Mares stated, "I see that magazine in your pocket, I don't want you

reaching for anything." Gov't Ex. 8 at 9:07. While the timing was close, it was not until seconds later—at 1:57 PM, when Sergeant Doose attempted to handcuff Mr. Ramirez—that Mr. Ramirez appears to have begun physically resisting arrest. *Id.* at 9:14.

Where officers discover evidence *before* the "new crime" transpires, multiple circuit courts have deemed the evidence inadmissible. *See, e.g.*, *United States v. Gaines*, 668 F.3d 170, 175 (4th Cir. 2012) ("where, as here, the discovery of the challenged evidence follows an unlawful search, but precedes an independent criminal act on the part of the defendant, that criminal act is not an intervening event for the purpose of determining whether the 'taint' of the unlawful police action is purged"); *United States v. Camacho,* 661 F.3d 718, 730 (1st Cir. 2011) ("Camacho's actions of shoving Officer Sousa and resisting arrest provided grounds for his arrest and a search incident to that arrest. But the validity of that search does not determine the suppression issue generated by the original unlawful seizure of Camacho . . . The gun was not discovered by a search incident to his arrest, but rather by the frisk that *preceded* Camacho's subsequent actions of shoving Officer Sousa and resisting arrest." (emphasis in original)); *United States v. Beauchamp,* 659 F.3d 560, 574 (6th Cir. 2011) ("Beauchamp's struggle cannot serve as an intervening circumstance because it does not come between the illegal seizure and the discovery of the evidence; there is no break in the chain."). The Tenth Circuit cited to this line of cases in *United States v. Gaines*, 918 F.3d 793 (10th Cir. 2019), where it found that an intervening circumstance had *not* occurred where an arrest warrant (the alleged intervening circumstance) "wasn't discovered until *after* the search" (which resulted in the discovery of drugs, cash, drug paraphernalia, and a firearm) had already taken place. *Id.* at 795, 801–02 (emphasis added).

Here, law enforcement likewise discovered the relevant evidence (the firearm) *before* Mr. Ramirez purportedly committed a new crime (resisting arrest).[19]  Thus, Mr. Ramirez's alleged resisting of arrest does not qualify as an intervening circumstance, and this factor tilts towards the defense.

### iii.  The purpose and flagrancy of the official misconduct

Finally, the defense argues that Sergeant Mares' decision to seize Mr. Ramirez—despite his incongruity with the suspect description—qualifies as purposeful and flagrant.  Doc. 41 at 5. This argument is unavailing.  As the Tenth Circuit has explained, courts consider conduct purposeful and flagrant where

> (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

*Fox*, 600 F.3d at 1261 (citation and internal quotation marks omitted).  While Sergeant Mares lacked reasonable suspicion to stop Mr. Ramirez, that violation was not so egregious that the "impropriety of" his actions would have been "obvious" to him at the time.  Thus, this factor leans towards the government.

In sum, the Court finds that the first and second *Brown* factors favor suppression, while the third factor weighs against it.  Thus, on the whole, the factors outlined in *Brown* support

---

[19] At the hearing, Sergeant Mares made clear that he knew that Mr. Ramirez had a weapon—and not just a magazine—when he approached him (prior to the alleged resisting of arrest). Specifically, he stated, "as I got closer, I noticed that in his right front pocket there was a magazine protruding from his pocket" and that he "believed that there was a weapon inside the pocket" based on "the way the magazine was positioned."  H'rg Tr. at 94:15–21, 95:1–2.  He explained that the magazine was "kind of in a horizontal 45 angle" and that if it instead "was just a straight magazine, it would have dropped down in his pocket due to the position of everything."  *Id.* at 95:2–5.

suppression, and the government has not met the "heavy burden" required for attenuation. *Fox*, 600 F.3d at 1259.

## CONCLUSION

For the reasons set forth above, the Court finds that Sergeant Mares violated Mr. Ramirez's Fourth Amendment rights when he unlawfully detained him without reasonable suspicion. The Court will suppress the firearm officers located on Mr. Ramirez's person as a result of his unconstitutional seizure. Mr. Ramirez's Motion to Suppress [Doc. 35] is **GRANTED** in accordance with this order.

Dated this 17th day of July 2023.

MARTHA VAZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE